The next case for oral argument this morning is 24-2066, Dulworth v. Experian et al. Good morning, Mr. Rapp. May it please the court, Michael Rapp on behalf of Mr. and Mrs. Craig and Brianna Dulworth, appellants in this case. There are four questions to be considered on appeal. Number one, the plaintiffs had substantial evidence of both reputational and emotional damage and distress injuries. Did the district court err in its conclusions about the nature and the scope of the plaintiff's injuries and the damage that flowed from them? Number two, did the district court err when it concluded the plaintiff's allegations and of inaccuracy pertained only to the questions of a legal duty? And three, plaintiff's evidence of the undisputed facts that created a factual question about the reasonableness of both the defendant's procedures for reporting and investigating the ally loan. For the purposes of both EB and I, 1681 EB and 1681 I, the reasonableness of the CRA's procedures is generally a question of fact for the jury. So did the district court err by failing to recognize those questions? And lastly, a plaintiff can prove the CRA willfully violated the FCRA by showing that it acted recklessly or knowingly or deliberately when it violated the statute. So did the district court err in concluding the plaintiff could not prove any willful violations? Ultimately, in this case, I would start with the fact that both the CRA's and their joint motion for summary judgment have very different situations. They were not in the same position. One decided through its own internal policies to not respond to the dispute at all. There was no record that they had of even receiving it despite the postal service having green cards showing that they were received and stamped and received by Experian, otherwise disposed of. And Equifax did actually conduct the investigations and came to a conclusion that they were going to believe exactly what they got from Ally, relying upon the reasonable, reliable furniture standard. I think that this court in Chytoff probably answered this case most succinctly. Is a contract a legal question or is it a factual question? I do not believe the TPP in Chytoff is significantly different than the existence of a reaffirmation agreement inside of a bankruptcy. Once they were presented, as in Chytoff, with inside the dispute of the existence of that contract, why did they not dig any deeper than looking at their computer screens and asking the furnisher of the information for a thumbs up or a thumbs down? Is it the question here more than just the existence of the reaffirmation agreement? Isn't the question really the validity of it? I don't believe so, Your Honor, and for two reasons. Number one... Answering in those two reasons, please. Why the existence of the reaffirmation agreement on the bankruptcy docket would let them know anything? Because there are conditions to it. There's nothing from the court saying this is in existence, that they've complied with it. There's nothing at the end of it saying reaffirmation is still in place. So answer that if you would, please. I appreciate the question, Your Honor. I think that that is salient but also analogous to every contract question. Why would the existence of any contract ever be evidence enough of something? There's always compliance issues with any type of contract. And they have two pieces here. Number one, Ally is telling them that they are making these payments, that information is being submitted to each of the CRAs. That's number one. And that was ignored or suppressed by both of them. Number two... The validity of the agreement was never brought into question until litigation commenced. It has not been Ally's position that the agreement was invalid. Their own testimony of their 30 v. 6 witness said that in their computer systems it shows as valid, and they never treated it otherwise. They may have misreported it to the CRAs, but that is what the point of the investigation is. And maybe thirdly, and I would pose a different question, why would Ally's testimony be inherently more reliable than a court record? Don't we give full faith and credit to competent jurisdictions? If there was nothing from the court to say that it was invalid, that they had disregarded it, isn't it an adjudicated matter? Why would... But it's not an adjudicated matter, right? I mean, that's the... I think the Loesch case is kind of an interesting comparison because there, the debtor actually obtained a court order with regard to the validity of the reaffirmation agreement or the agreement at issue there. Whereas here, the parties signed it, met some of the procedural elements, and then filed it. Isn't that different from a court actually, as Judge St. Eve noted, kind of blessing it and approving it as valid? The only question I would pose in response... My answer to that is, when is it enough? What more would this particular debtor have to have done? to them, here's my agreement, I complied with it fully and completely. And it was not taken at any point in time by the CRAs as valid. They decided internally, based upon their own procedures, that they were going to believe the rote reporting, the automated computer dispute verification form from Ally that was transmitted back to them as valid. So they decided in that moment to ignore the documents in front of them and not query any deeper than their own computer screens and decide that that information was invalid. It is not Ally's position. It seems to me that, I mean, they were put in this position where they had to choose one or the other, right? I mean, they went back to Ally by submitting their query. Ally came back and said the loan was discharged. So they have that. And then they have statements from your client saying that the Ally loan was reaffirmed. And so at that point, they're in a position where they have to decide. And isn't that... The question here, it seems to me, is, is that a factual determination or more of a legal one? And, you know, I guess to make... It seems like that's a dispute that a court is better handled or able to handle than, say, you know, a CRA. I can appreciate the statement. The question, though, is when would you not have to go back to a court to look at a document to say, is this still valid? That's number one. Number two is the statute actually already gives them a remedy, which is under I, all you have to do, if you have conflicting information that you cannot verify, you suppress it. They chose to do otherwise. They chose to believe Ally and ignore the court records. But only if it's factual. And I don't understand why the court records are less valuable than... Only if it's factual. If it's a legal question, you don't have to do anything else. And our case law makes that very clear. Absolutely. So why is a TPP less of a fact or more of a fact than the contract between the debtors in this case, the debtor and Ally in this case, than it would have been between Ocwin and Chytov? I don't see the difference. In fact, the only thing that I see different between those two is that there was a court overseeing this contract, and at no point in time did they render it invalid. It was not until this litigation that the question of validity was even injected. It's still not. What do you make of the difference in that the TPP in Chytov specifically said that the furnisher or the creditor would provide the information of the TPP to the CRA? And so from the face of the document, the CRA can look at it and say, okay, well, you know, I guess the creditor had agreed to give us notice, and the creditor didn't. I agree with that, but that's a different analysis. What we're looking at there is, did they even know that such a grievance existed otherwise? And they were provided with it in the dispute, both in this case and in the Chytov case. So they had knowledge of it. They actually had knowledge of the payments that were being made, so they have now conflicting information that is not just a standard run-of-the-mill situation. And they chose to disregard it and concluded that this must not be valid or it's not something that they have to look at. If that's the case, then their reporting of bankruptcy, this is not unusual. This is not so bizarre and outlandish that this doesn't happen regularly. They regularly report bankruptcy information. They were very narrowly tailored to say in the dispute that my problem is not that I didn't declare bankruptcy or this wasn't included. It was very clearly included and held aside by this contract, and they chose not to believe that and continue to report it as discharge, denying them the good payment history and which flows to the next question, which is damages. The damages in this case were disregarded by the trial court in two ways. One, the reputational harm of the loss of the credit history, which did make getting a new loan more complicated and more expensive. But the second piece was ignoring the emotional distress injuries, and I believe that in this discussed husband and wife supporting each other's damages. On the face of it alone, that should be enough. There was physical manifestation. But we've been very clear that just broad conclusory statements about emotional damages are not sufficient. Absolutely, and I believe that we met that standard. And what's your evidence beyond just statements that they were frustrated or aggravated? What's the evidence to support? The higher blood pressure. There was manifestations that were physical that were described by each other and referenced in other witnesses and to include her employer. But how do you connect the higher blood pressure to this case and to what happened here as opposed to the bankruptcy? Because the testimony in the district court was that, oh, it might be connected to what happened here. And the testimony and what the court found was that it was more in relation and as a general result of the bankruptcy stress. I appreciate that question, Your Honor. Actually, that would be a weighing of the evidence by the trial court. No, it wasn't a weighing. It was saying there's no support. I believe that the testimony was very clear by both the husband and wife that this was a problem, that it stemmed from this. Whether or not there were other factors in their life that were complicated or also things for a jury to weigh in calculating the damages. You're into your rebuttal time if you want to save some. I would be happy to, but I also want to answer all of your questions. But I believe that just as a summation to this, it is also important to bring up the fact that Experian decided based upon their own policies to do no investigation whatsoever. That's never been in dispute. And that Equifax came to a conclusion where they just purely parroted it. I don't think that Experian should be able to rely upon an envelope that they never opened. Or if they did, they judged the content of it by the character of the envelope itself. Thank you very much. We believe you're screwed. Can I ask you a question about reputational damage? Of course, Your Honor. So I think the denial letters don't mention Experian. And so I think you're relying upon the hard inquiries that were made that are set forth in the documents, right? Yes and no, Your Honor. Okay. I guess my question is, and I think you make a statement that it's reasonable to infer that, for example, Citibank, who made a hard inquiry, found the statement and the omission of the other statement to be deflammatory. And I guess my question to you is, why is that a reasonable assumption? It's also incomplete, which is also required by the statute. It did not include the valid, good payment history that they had earned by making their payments. They're not in the same position as a bankruptcy debtor who paid nothing to anyone. Okay, but we're focusing on defamation, right, and the reputational harm. Absolutely. And so why is it a reasonable inference to make that Citibank would have treated, would have had a better credit perspective of your clients if, rather than saying that the loan was discharged, in other words, clean slate, if it said, you know what, this loan actually survived and it's still alive and there is kind of a payment history? Because when you don't pay your debts, that is one calculation of risk. When you choose to pay your debts in addition to it, that is a different calculation of risk. So showing that they continued to make payments would make them a better credit risk than not. And that is a reasonable inference for a jury to weigh. Isn't there also a risk that, I mean, given the fact that that loan is still out there, that isn't that a credit risk as opposed to the loan being discharged? I believe that what you're talking about right now is weighing the evidence about the damages and about whether or not the reputational harm. No, I'm talking about a reasonable inference about why, how a jury can make such a determination without any sort of, let's say, expert testimony or some other indication of what it all means. Well, the expert testimony in our case did talk about the, from Evan Hendricks, discussed the fact of how credit scores are calculated. You can't discuss damages, but you can look at the reasonableness of those two things. And a person who's paying their debts versus a person who did not pay debts at all, one has a credit history and one does not. A complete break versus somebody who still has a credit score. And if you look at the denial letter for one, it does say that that lack of credit history was a factor. If they had included the full credit history, it would have improved their credit situation. That is one reasonable inference. The second thing, though, is when it comes to Experian, their credit score was, their credit reports were accessed by other people in addition to it. But that's a different standard regardless. But thank you very much. Thank you. Mr. Johnson. Good morning, Your Honors. May it please the Court. Jeff Johnson on behalf of Experian. Just to start with my colleague's comments about injuries in this case, let's start with the first one that he led with, which was emotional damages. I think even in this morning's presentation, I haven't heard a challenge to the bankruptcy courts, excuse me, to the district courts, key conclusion to start with, that there's no evidence that traces any of it to the actions of Experian particularly. Of course it's stressful to go through bankruptcy. Of course it's stressful to have a reporting problem with Ally. But the testimony on pages 226 and 227 of the appendix is quite clear that she only testified about the overall sort of situation, and even then only in terms that this Court has repeatedly said don't qualify as sufficient evidence of damages. I find it noteworthy that my colleague's primary citation on this point was to the Fifth Circuit and not to this Circuit. As we said in our brief, the Circuit's case law is very strict and expressly says that it's strict on that point. So I think that sort of that's enough to solve the injury of emotional damages. As for the reputational injury, I think, Your Honor, you hit on the key question, what do we do with this hard inquiries that are present on here? And, again, I think this Court's decision in Freeman is very clear that that's just not enough. There were hard inquiries in Freeman. The decision says, the record also contains Freeman's, excuse me, the record indicates that Quicken Loans and Chase Card requested her credit report from TransUnion and that those reports contained Auckland's inaccurate reporting. And this Court said that wasn't enough to prove that the person in question understood the defamatory significance of the statements at issue. I also think it's very telling, as Your Honor sort of indicated, that what we don't have here as to Experian, we have a number of denials of credit that say, we pulled the credit, we lowered the score, we denied you this application because of TransUnion's reporting or something like that. There's nothing like that for Experian, especially for the loan report that comes after they raise their dispute. I think there was evidence, though, to support that Experian actually published some of the credit reports to third parties. The district court said there wasn't, but I think there was some evidence that was overlooked.  Inside plaintiff's dispute contains copies of the report that show that certain individuals made hard inquiries. That isn't enough under Freeman. It's not mere publication. It's publication where someone understands the defamatory significance. What about if information is published that everyone would agree would be negative? In other words, say that there was a default of a loan when the loan was actually not defaulted. In that context, couldn't a jury reasonably infer that that would be negative to anyone in the industry? I think it would have to be a pretty high bar to reach that level. Also, for instance, I think TransUnion, the Supreme Court case. If someone calls you a terrorist on your credit report, that's something that the pain of that comes instantly to mind. Everyone sees, everyone understands. I think in the credit context it's difficult because you need to remember even for hard inquiries, one, there's a statutory obligation to report if you relied on that in making a decision. So we're going to have evidence of what you thought about, what you knew about. It's also here, I mean, you can imagine that the Best Buy computers, for instance, or the Best Buy checkers say, okay, this is your fourth bankruptcy. We don't need to look any further into whether we're going to extend credit here. To your first point, that's something I hadn't focused on. So you're saying that if the hard inquiries led to, was part of some decision, some credit decision, that those people had to provide the appellant with notice. Right, and that's why we have in the record so many copies of notes that say, you know, this is the teacher's bank. You applied to get credit for a car, and we're denying you, and that was based in part on these reasons. And we don't have a single record like that in this record as to experience. And so I think that that sort of suffices to show why there's no standing in this case, even if the district court, you know, didn't quite put it in the right bucket. I think Freeman involved a loan listed as delinquent, and we found that that wasn't sufficient to establish the reputational damages, or that the credit reporting agency understood the defamatory nature of that loan. Right. So I guess where's the line between terrorist in TransUnion and delinquent loan? That's fair. I mean, I have to say, I feel like we're on the same sideline as Freeman must be. Of course, when Chase Card and Quicken Loans are asking for a report about the Freeman's credit, of course a delinquent loan is going to be on there. Here, as we can talk about briefly, or as my colleague will discuss probably in more detail, we're talking about a legal question about whether there was a reaffirmation agreement that was validly entered, and then some subsequent payments that only matter if they were made pursuant to that affirmation agreement. And so I think this case is a fortiori from Freeman. If this court was correct that there was no standing in Freeman, then there's no standing here. Mr. Johnson, if there's no standing here, does this get remanded back to the state court? The statute does say that you should remand after that happens. It does say shall. That statute is not jurisdictional in the sense that if you don't ask for that remedy in your opening brief on appeal, I think you can waive that objection. What we have here is nothing in the opening brief about a remand being the right order of action, and then a line in the reply brief about that. And so I don't think that it's been sort of correctly processed here. I will note also that remand in this case is kind of going to – this court will decide in the Equifax half of this case the merits of the legal inaccuracy thing, so I think it will be fairly clear the writing will be on the wall for that point. And then just very briefly on the legal versus factual point, everything this court said in Schulenbat about what makes something legal versus factual applies all the more strongly here. To know whether or not those payments that were being made were pursuant to an obligation or purely voluntary, the CRAs had to know whether they were made pursuant to a valid agreement to reaffirm or not. Knowing whether that's valid or not requires the exercise of legal judgment, and unlike in this court's decision in Chadoff or unlike in the Eleventh Circuit's decision in Loesch, there was no document that liquidated that legal question into a factual point. There was nothing that said this has been adjudicated to be invalid one way or the other, and so I think it follows pretty straightforwardly from Schulenbat. Thank you, Your Honor. Thank you, Mr. Johnson. Mr. Barton. Good morning. Good morning. May it please the Court, Eric Barton for Equifax. I wanted to just dive right into the legal versus factual issue, and I believe appellants counsel used the phrase, when is enough enough? When is enough enough for a consumer to show that they complied with an agreement? And to be clear, just because a case involves a legal contract doesn't mean it automatically is, therefore, a legal argument that can never be resolved by a credit reporting agency, and the case law is clear on that because in the situation we have cases that involve contracts, like the Shadoff case, where the court held, no, it did involve a contract, a legal contract, but it's still considered a factual dispute, and I believe the court's reasoning is sound because in that case, as I believe the Court is aware, in that case, sure, there was a legal contract. There was also proof provided by the consumer that they timely made the payments required by that legal contract and proof in the form of a letter from the furnisher that they received those payments. So you put the three together. You got a contract. You got proof of payments, and you got an acknowledgment of timely payments, and the court was clear in that situation you don't get a get-out-of-jail-free card to say, well, there was a contract, so therefore it's a legal dispute. That is not the situation we have here. The situation we have here is we have the appellants, the plaintiffs, point to a reaffirmation agreement and want to say, well, that's it. There's a reaffirmation agreement, and therefore, Equifax, you're wrong and you're reporting. But I believe, as the court highlighted with some of its questions, there's so much more that goes into it than just the existence of a reaffirmation agreement on a bankruptcy docket. And as the district court properly noted, simply examining the bankruptcy docket wouldn't show whether or not the dull worse. You know, was the agreement properly signed? Was it a legally valid agreement? Did they comply with the terms of that agreement over the set period of time? Whether that dull worse ever rescinded that agreement? We simply don't know. In order to do that, you'd have to make a legal determination. And, you know, and we do not have what we have in the Chaytoff case. We do not have a situation where the dull worse in their disputes to Equifax or Experian not only provided the agreement, but then said, look, here's proof of payment and here's an acknowledgement by the furnisher that they received the payments or that the reaffirmation agreement is in effect. Kelly's ACDB report lists the loan at issue here as discharged in bankruptcy but current. Why wouldn't that be enough to put you on notice of an inaccuracy and a factual inaccuracy? I believe because you could argue and plaintiff's counsels argue that that is inherently conflicting statements. Respectfully, I don't believe that's inherently contradictory. There are plenty of situations where you can have situations where someone, such as perhaps here, goes into bankruptcy, has a vehicle that they're making payments on that's included in the bankruptcy, but perhaps wants to starve off the repossession of their vehicle. Mrs. Dulworth, who had this vehicle, said that she was using this to get to and from work. So maybe they make payments to the lender to say so they don't get their vehicle repossessed. The lender stands down on its right to legally repossess it. They make the payments technically, quote, unquote, voluntary payments for that. And so, yes, the trade line at issue is included in bankruptcy, but it's still listed as current. In this case, tellingly, the furnisher did not provide monthly payments because it was included in bankruptcy. If we had a situation perhaps where they had a payment history where it was showing payments being made, perhaps that tilts the needle a bit further, but we don't have that situation here. We had a reliable furnisher. There's no evidence that Ally is an unreliable furnisher that was repeatedly stating that this was a trade line that was included in bankruptcy. We had no information provided by the consumers that would cause Equifax to unilaterally override the reporting by a trusted furnisher and, therefore, this is clearly a legal dispute. You would have to resolve a legal dispute, which this court, all the cases set forth in the briefing highlight. Counsel, if the Dulworths had provided proof of payment, then what? Because the duty here is to reinvestigate if there's a question. I could argue, perhaps, again, the needle analogy. It may move the needle a bit further, but at the end of the day, whether they were actually – if they said here's a bank account and here's us making payments, they very well could be making payments on a car loan. But isn't that where the duty to investigate comes in for Equifax? If they had done that, perhaps it would – well, respectfully, I don't believe that that takes us out of whether it's a legal analysis or not. Because at the end of the day, whether there were payments being made or not payments being made by the Dulworths on this trade line, the issue is was there an enforceable reaffirmation agreement that the Dulworths complied with. But in bankruptcies, my understanding is oftentimes there's no court order validating a reaffirmation agreement. And so does this mean that Equifax is always off the hook unless there's a court order? I don't believe we're always off the hook because this is a situation that the Dulworths were aware of this for quite some time. And if we were dealing with a situation, which we are not, where they had gone to the bankruptcy court and gotten clarity and provided that additional information to Equifax, perhaps then we'd be in a different situation. But we have to look at purely at the information that Equifax had that was provided to it by the Dulworths and what was available to it by reviewing the bankruptcy docket as well as what Ally, a relied furnisher, was telling it. And there was no way the middleman of Equifax or Experian could determine – make the legal determination about the enforceability of that reaffirmation agreement. Thank you. Thank you, Mr. Barton. Mr. Rapp, I think your time was up, but we'll give you one minute. I appreciate that, Your Honor. That's very gracious. I would start off with the fact that the Chidoff's case, the thrust of it was also legal versus factual. They stated then that that was a legal versus factual argument and this court decided differently. Mr. Barton brought up three steps, the proof of the payment, the fact that there wasn't a dispute about the contract existed, or its validity. I think that there was a contract of proof payments and there wasn't a dispute to the validity. In this case, it's identical to that because we had the contract. We had proof of payment that was distributed to the CRAs by Ally. It was in the normal monthly reporting that they would get in their tapes. Number three, which is it was never disputed by Ally that this was a valid agreement. This is a complete injection throughout the litigation process. It didn't exist before that. Lastly, when we're just talking about the questions that need to be asked or whether or not the dullers could have said more, I think at no point in time did Equifax ever ask Ally, is this reaffirmation agreement valid? They never posed any questions whatsoever. They looked at the computer screen. They looked at the reporting. They said, verify everything. And they said, thumbs up. And that was the end of their investigation. They probed no further despite the fact they had this payment history. So again, Ally is reasonable as a matter of law is what this court has decided, yet the bankruptcy court's documents are not reasonable as a matter of law, period. We think that that's a problem. Thank you very much. Thanks to both sides. The court will take the case under advisement.